IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| SANA HEALTHCARE CARROLLTON, LLC d/b/a CARROLLTON REGIONAL MEDICAL CENTER, Plaintiff, <br><br> v. <br><br> DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al*., Defendants. | Civil Action No. 4:23-cv-00738-ALM <br><br> Judge Amos L. Mazzant |

**DECLARATION OF ALEXANDRA HUTTINGER, DEPUTY ASSOCIATE ADMINISTRATOR, PROVIDER RELIEF BUREAU, HEALTH RESOURCES AND SERVICES ADMINISTRATION, DEPARTMENT OF HEALTH AND HUMAN SERVICES**

I, Alexandra Huttinger, hereby declare that my testimony below is true and correct to the best of my knowledge and belief and is given under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am the Deputy Associate Administrator for the Provider Relief Bureau ("PRB"), a Bureau within the Health Resources and Services Administration ("HRSA"), United States Department of Health and Human Services ("HHS" or "the Department").

2. I have worked with the Provider Relief Fund since April 2, 2020, and have worked continuously with the program with the exception of seven weeks in 2021 (from March 1, 2021 to April 23, 2021).

3. HRSA's PRB administers the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured

1

Program ("Uninsured Program" or "UIP") on behalf of HHS.

4.      As Deputy Associate Administrator, I oversee all aspects of PRB's direct provider support and claims reimbursement programs.

5.      In carrying out these responsibilities, I am involved in all major activities and decision-making implicating the various programs and funding streams administered by the PRB, such as overseeing programmatic and policy decisions, budget formulation, and day-to-day programmatic operations.

6.      While I am not personally involved in all communications and decision-making for the PRB, as Deputy Associate Administrator, one of my core functions is to oversee operations by monitoring and liaising with the various staff members who are responsible for the day-to-day management of the various programs under PRB's purview, including the Uninsured Program.

7.      I am familiar with the Plaintiff's allegations in the above-captioned matter, and I have personal knowledge of the facts underlying these allegations.  Indeed, as described below and shown in the attached exhibits, I was the direct recipient of much of Plaintiff's pre-litigation correspondence regarding their UIP claim submission issue that is the subject of their preliminary injunction request, and was directly involved in investigating their assertions and preparing HRSA's written responses.  As part of that process, I directed my staff to collect and analyze records within HRSA's custody and control germane to Plaintiff's assertions, and further directed the collection and review of relevant communication and database records from the UIP contractor who administers the electronic platforms used by providers to submit claims for reimbursement.  I have reviewed all this material in connection with the preparation of this declaration and have attached true and accurate copies as exhibits as cited below.

8.  I submit this declaration in support of the Government's opposition to Plaintiff's application for a preliminary injunction, and in order to explain: (i) the Uninsured Program and its processes, particularly the multi-step procedure for submitting claims for reimbursement; (ii) the circumstances surrounding the imposition of the March 22, 2022 claim submission deadline; (iii) the Parties' correspondence regarding Plaintiff's attempted March 17, 2022 patient roster submission; and (iv) HRSA's understanding of what happened based on the records in its possession.

## I. Uninsured Program

### a. Statutory Framework

9.  In the response to the COVID-19 pandemic, Congress passed a raft of legislation and funding to help fortify the country's health system against the myriad pressures that would be inflicted by this unprecedented public health emergency.

10. On March 27, 2020, Congress passed the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), which appropriated $100 billion to the Public Health and Social Services Emergency Fund for health care providers "for health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. No. 116–136, 134 Stat. 281 (2020). HHS created the Provider Relief Fund ("PRF") using these funds.

11. Within the PRF, a portion of the funding supported health care-related expenses attributable to COVID-19 testing for the uninsured and treatment of uninsured individuals with COVID-19. A portion of the funding was also used to reimburse providers for administering Food and Drug Administration ("FDA")-authorized or -licensed COVID-19 vaccines to uninsured individuals.

12. Additional amounts were appropriated through the Families First Coronavirus Response Act ("FFCRA"), P.L 116-127, 134 Stat. 178 (2020); the Paycheck Protection Program and Health Care Enhancement Act ("PPPHCEA"), P.L. 116-139, 134 Stat. 620 (2020); and the American Rescue Plan Act of 2021 ("ARPA"), P.L. 117-2, 135 Stat. 40.

13. The CARES Act and subsequent statutes tasked the Secretary of HHS with "reimburs[ing] through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus[.]" CARES Act, 134 Stat. at 563; PPPHCEA, 134 Stat. at 622-623. Further, the CARES Act and subsequent statutes provided that recipients of payments "shall submit reports and maintain documentation as the Secretary determines are needed to ensure compliance with conditions that are imposed by [the CARES Act, the PPHCEA] for such payments, and such reports and documentation shall be in such form, with such content and in such time as the Secretary may prescribe for such purpose . . . ." *Id.* To be eligible for payment, an eligible health care provider must "provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19" and submit to HHS "an application that includes a statement justifying the need of the provider for the payment and the eligible healthcare provider shall have a valid tax identification number." CARES Act, 134 Stat. at 563; PPPHCEA, 134 Stat. at 623. Finally, the CARES Act and subsequent statutes require that funds "not be used to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse." CARES Act, 134 Stat. at 563; PPPHCEA, 134 Stat. at 622.

14. At the time the Congress enacted these laws, the American healthcare system as a whole was facing an existential crisis. The paramount goal for HHS and HRSA (collectively, "the Agency") was to get funds to providers nationwide as quickly and efficiently as possible. Accordingly, the CARES Act and subsequent statutes required the Agency to make payments "in

consideration of the most efficient payment systems practicable to provide emergency payment." CARES Act, 134 Stat. at 563; PPPHCEA, 134 Stat. at 622-623.

**b. UIP Overview**

15.     Generally speaking, the Uninsured Program is a voluntary program that provided reimbursement for claims on a rolling basis to eligible health care providers and facilities for testing, treatment, and vaccine administration of uninsured individuals during a prescribed time period.

16.     Specifically, health care entities who conducted COVID-19 testing of uninsured individuals, provided treatment to uninsured individuals with a COVID-19 primary diagnosis, or administered an FDA-authorized or -licensed COVID-19 vaccine to uninsured individuals on or after February 4, 2020, could submit claims for reimbursement to the program electronically, which were reimbursed generally at Medicare rates, subject to available funding.  As described below, providers were made aware that reimbursement was subject to available funding through statements on various program webpages, FAQs, and as part of the patient roster submission process.  A patient is considered uninsured if the patient did not have any health care coverage at the time services were rendered.

17.     The purpose of the program was to ensure the estimated 29 million uninsured individuals nationwide had access to COVID-19 testing, treatment, and vaccination during the pandemic.  The UIP built on existing infrastructure (e.g., using the Medicare billing system that providers commonly use and generally aligning with Medicare processes, pricing, and codes) to mitigate COVID-19 transmission and its impact by removing cost as a barrier to COVID-19 testing, treatment, and vaccination and supporting providers serving a vulnerable population during a public health crisis.

18.     In 2020, HRSA contracted with UnitedHealth Group ("UnitedHealth") to help administer the Uninsured Program.[1]  At all times, UnitedHealth served only a technical administrative role implementing the UIP's enrollment and claim submission and adjudication processes, including assisting providers with technical issues as they arose.  All program funding, coverage, and reimbursement policies are set forth by the Agency, and all eligibility determinations and claim adjudication policies are made by the Agency. As a contractor with a purely administrative function, UnitedHealth's role was to utilize its technological expertise to quickly enable claims processing and reimbursement for COVID-19 testing and treatment (and vaccination administration fees, once vaccines were available), as directed by HRSA. At no point was UnitedHealth ever authorized by the Agency to waive deadlines or modify claim submission procedures for non-compliant providers.

19.     The UIP is entirely electronic and providers are required to use two systems: the UIP Portal and the Medicare Electronic Data Interchange ("MEDI").  The UIP Portal is used by providers to (1) enroll in the Uninsured Program, and (2) submit a "patient roster", as detailed further below.  Once this process is complete (i.e., the providers are enrolled and the provider successfully submits patient rosters), UnitedHealth generates temporary patient identification numbers ("temporary patient IDs" or "temporary IDs"), which providers then use to submit claims for reimbursement utilizing the MEDI, a system widely used throughout the provider community.

20.     Participant providers must attest to certain terms and conditions, including that the provider acknowledges that full compliance with the terms and conditions is material to the Secretary's decision to disburse funds; that all information provided is true, accurate and complete to the best of the provider's knowledge; the provider understands that non-compliance may result

---

[1] Since 2022, HRSA's contract has been with OptumServe Technology Services, Inc., which is a division of UnitedHealth.

in administrative, civil, or criminal action; the provider understands that failure to provide requested documentation may result in payments being denied; and the provider agrees that all claims it submits will be full and complete. *See* Ex. 1, at 1-4 (UIP Terms & Conditions).

### c. Claims Submission Process

21.     In a nutshell, the claims submission process entails five basic steps: (1) provider enrollment; (2) provider's submission of patient rosters; (3) UnitedHealth's generation of temporary patient IDs (i.e., patient enrollment); (4) provider's submission of claims; and (5) claims adjudication and reimbursement (as applicable), subject to available funding.

22.     *First*, the health care entity must enroll in the Uninsured Program as a participant, either individually in the case of a single provider or on behalf of multiple providers (e.g., a physicians group) via the UIP Portal in order to be able to submit claims and receive reimbursements for eligible services. *See* Ex. 2, at 6-7 (UIP FAQs).

23.     To enroll, the entity completes their Taxpayer Identification Number (TIN) Administrator enrollment and links the bank account(s) that will receive reimbursements. If the health care entity does not currently do business with UnitedHealth, they also must submit a provider roster (i.e., a list of individual health care providers who will actually provide the services/treatment). This information is required to ensure compliance with the statutory requirement that providers shall have a valid Tax Identification Number.

24.     *Second*, the provider submits the required patient information (also referred to as a patient roster) in the UIP Portal. Patient information is required to confirm the patient meets the definition of uninsured and that funds are not used to reimburse expenses that have been reimbursed from other sources or that other sources are obligated to reimburse (e.g., claims for patients that are enrolled in public or private insurance).

25. When uploading patient information into the UIP Portal, the provider must attest that they have checked for health coverage and confirmed the patient is eligible (i.e., uninsured), accept the UIP Terms and Conditions, will accept the reimbursement as payment in full and not balance bill the patient, agree to provide any information requested for quality assurance/compliance, auditing, and reporting purposes, and acknowledge that reimbursement is subject to available funding. *See* Ex. 3 (Sample batch upload attestation).

26. Patient information can be submitted for individual patients one-at-a-time, or information for multiple patients can be submitted simultaneously through a "batch upload," which is the most common method of submitting patient information. The patient roster file must comply with certain technical specifications. *See* Ex. 4 (Patient roster file format specifications).

27. If a provider submits a non-conforming patient roster, the provider will immediately receive an error screen alerting them to a problem with their submission. *See* Ex. 5 (Sample upload rejection page).

28. After the provider successfully uploads a patient roster, the UIP Portal immediately provides a batch load reference number. This number is the provider's proof that the patient roster was submitted. *See* Ex. 6 (Sample successful upload page).

29. In addition to the on-screen message, after the successful upload of a patient roster, the following day, the provider will receive an auto-generated email that confirms the receipt of the patient roster and identifies any patients from the submitted patient roster who already have a temporary ID assigned that has not expired (i.e., patients that were included in a previously submitted patient roster and for whom UnitedHealth has already verified eligibility, as described in Step 3 below). This email also provides information on how to access these temporary member IDs. *See* Ex. 7 (Sample patient roster confirmation email).

30.    *Third*, once the provider successfully uploads a patient roster into the UIP Portal, UnitedHealth analyzes the patient information to verify eligibility, and only after it is verified, assigns a temporary patient ID.  A unique temporary patient ID is assigned to each verified patient included in the upload.  The process of generating and assigning temporary patient IDs typically took between one and five days.  Ex. 8, at 23, 28 (UIP webinar PowerPoint).

31.    *Fourth*, only after temporary patient IDs have been generated and assigned to the patients can a provider submit the patient's associated claims electronically via the MEDI.  This is the platform used by healthcare providers to submit claims for payment to payors, such as insurance companies and government programs like Medicare and Medicaid.

32.    *Finally*, once the provider has submitted a claim electronically via the MEDI, the claim is validated and adjudicated (i.e., claim is paid or denied) and a direct payment is made from the Uninsured Program funds directly to the provider (as applicable), subject to the availability of funds.

33.    Most claims were reimbursed within 30 days of submission.

### d.  Technical Assistance

34.    To facilitate the claims submission process, HRSA posted guidance on both its own website and a program website hosted by its contractor (UnitedHealth), posted FAQs and a User Guide, and convened instructional sessions to educate the provider community about the Uninsured Program and how it operates.

35.    For instance, on April 13, 2021, HRSA convened a webinar that provided an in-depth walk-through of the Uninsured Program processes and procedures, and made the presentation materials publicly available.  *See* Ex. 8 (UIP webinar PowerPoint).

36.     HRSA also published a series of FAQs to further assist providers in understanding how the Uninsured Program works.  *See* Ex. 2 (UIP FAQs).

37.     In addition, HRSA disseminated fact sheets to the provider and patient communities.  *See* Ex. 9 (UIP provider fact sheet); Ex. 10 (UIP patient fact sheet).

38.     Finally, an interactive website was established to provide detailed information about the steps for submitting claims, including instructional videos.  *See* HRSA COVID-19 - What You Need (linkhealth.com) (detailing steps of claim submission process under the "What You Need", "Patient Details," and "Claims Reimbursement" tabs).

**II.     March 22, 2022 Deadline**

39.     Eligible providers began enrolling in the program on April 27, 2020 and submitting testing and treatment claims on May 6, 2020.  Providers began submitting vaccine administration claims on December 14, 2020.  Ex. 2 at 19 (UIP FAQs).

40.     On March 15, 2022, the White House announced the impending shutdown of the Uninsured Program due to a lack of sufficient funding.  *See* FACT SHEET: Consequences of Lack of Funding for Efforts to Combat COVID-19 if Congress Does Not Act | The White House ("The fund that reimburses doctors and other medical providers for caring for uninsured individuals will start to be scaled back this month and end completely in early April.  Specifically, one week from today – March 22 – the Uninsured Program will stop accepting new claims for testing and treatment due to lack of sufficient funds. Providers will no longer be able to submit claims for providing these services to uninsured individuals, forcing providers to either absorb the cost or turn away people who are uninsured . . . .").

41.     The next day, HRSA announced (via UnitedHealth) the impending program shutdown and provided the precise testing/treatment claim submission deadline of March 22, 2022

at 11:59 pm ET to the participant providers.  *See* Ex. 11 (Mar. 16, 2022 deadline notice).  A reminder notice was emailed to participant providers in the final days of the claim submission period.  *See* Ex. 12 (Mar. 21, 2022 deadline notice).

42.     HRSA also posted a set of deadline FAQs on its website.  *See* Ex. 13, at 1 (Deadline FAQs).  The Deadline FAQs explained that "[t]esting and treatment claims submitted after the deadline, will NOT be adjudicated."  *Id.* at 2.   The Deadline FAQs further cautioned that "[r]egardless of whether the system shows your claim as having been received, no testing or treatment claim submitted after March 22, 2022, will be processed." *Id.* at 3.

43.     It is my understanding that the decision to shut down the UIP was necessary because by late 2021, the UIP monthly "burn rate" (i.e., the amount of money being disbursed as reimbursements) was approximately $2 billion per month and the Agency projected the limited pool of available funding would be depleted by mid-March 2022.

44.     Since the UIP began, more than 231 million claims were reimbursed totaling approximately $24.4 billion.

45.     Of those funds, approximately $5.7 million has been disbursed to Plaintiff for the approximately 2,300 testing/treatment claims it properly submitted prior to the March 22, 2022 deadline.

**III.     Parties' Correspondence Regarding Attempted March 17, 2022 Submission**

46.     In order to provide the Court with a complete picture of the parties' communications, attached and outlined below is the parties' formal written correspondence regarding Plaintiff's March 17, 2022 attempted patient roster submission, which consists of:

- An initial January 11, 2023 letter from Morgan Nighan (of Nixon Peabody on behalf of CRMC) to Alexandra Huttinger (HRSA) et al., attached hereto as "Exhibit 14";

- A February 17, 2023 response from A. Huttinger (HRSA) to M. Nighan (CRMC), attached hereto as "Exhibit 15";

- An April 5, 2023 reply from M. Nighan (CRMC) to A. Huttinger (HRSA) et al., attached hereto as "Exhibit 16"; and

- An April 25, 2023 reply from A. Huttinger (HRSA) to M. Nighan (CRMC), attached hereto as "Exhibit 17".

47. In summary, Plaintiff's January 11, 2023 letter states that, "On March 17, 2022, [Plaintiff] submitted approximately 285 claims to the Uninsured Fund. However, due to a system issue caused by overwhelming claim submission volume, patient identification numbers for the submitted claims were not immediately generated by United[Health]. That same day, [Plaintiff] contacted United[Health], who verified the various uploads and indicated that the system was overloaded and did not properly generate the patient identification numbers. United[Health] gave [Plaintiff] a claim ticket # D1237." Ex. 14, at 3 (Jan. 11, 2023 CRMC ltr.); *id.* at 4 ("[Plaintiff] timely submitted at least 285 claims to the Uninsured Fund on March 17, 2022 . . . .").

48. In its February 17, 2023 response, HRSA summarized the claim submission process and explained that, "According to HRSA's records, [Plaintiff] logged into the Uninsured Program portal on March 17, 2022, but did not upload a patient roster on that date. Therefore, no Temporary Member IDs could be assigned, a prerequisite to submit claims. . . . Further, HRSA has no evidence of any technical error with the Uninsured Program portal that would have impeded

[Plaintiff] from uploading a patient roster on that day [March 17, 2022]." Ex. 15, at 2-3 (Feb. 17, 2023 HRSA resp.).

49.     Plaintiff replied on April 5, 2023, contesting that they had failed to upload a patient roster on March 17, 2022 and attached the declaration of Plaintiff's Chief Legal Officer, Radha Savitala, who declared that, "On March 17, 2022, on behalf of [Plaintiff], I submitted a patient batch of 285 claims to the Uninsured Fund in the format required by HRSA/United[Health] for various dates of service related to uninsured COVID-19 care . . . . I uploaded the spreadsheet of patient claims in the manner required by HRSA and United[Health], and in the same manner that I had previously done for other claims submitted to the Uninsured Fund." Ex. 16, at 6 (Apr. 5, 2023 CRMC reply).

50.     HRSA's April 25, 2023 reply acknowledged receipt of Plaintiff's April 5, 2022 letter, but reaffirmed the explanation provided in HRSA's February 17, 2023 response that, "According to HRSA's records, [Plaintiff] did not successfully upload a patient roster on March 17, 2022, and therefore did not complete the claim submission process by the claim submission deadlines" and reiterated that "HRSA is unable to extend these deadlines." Ex. 17, at 1 (Apr. 25, 2023 HRSA reply).

51.     In addition to the correspondence cited above, I have reviewed Plaintiff's complaint and preliminary injunction filing, including the attached declarations, and understand that Plaintiff believes it submitted reimbursement claims on March 17, 2022 by successfully uploading a patient roster on that date, as evidenced by a verbally-issued "claim ticket" and an autogenerated April 5, 2022 email from UnitedHealth, plus the assertions of Plaintiff's employees.

### IV. HRSA's Understanding of What Happened

52. Based on the records in HRSA's possession, I believe Plaintiff's position rests on two fundamental misunderstandings. First, Plaintiff is under the mistaken impression that it actually uploaded a patient roster on March 17, 2022. Second, Plaintiff appears to conflate steps 2 and 4 of the claim submission process described above, incorrectly assuming that the upload of a patient roster is sufficient to submit a claim for reimbursement.

**a. Plaintiff did not upload a patient roster on March 17, 2022.**

53. Plaintiff's assertion in the Savitala Declaration is inconsistent with Plaintiff's prior statements about the March 17, 2022 attempted submission—which describe a gross departure from the prescribed claim submission process—and is contradicted by HRSA's records of Plaintiff's patient roster uploads, or rather lack thereof. *See* Savitala Decl., at 2, ¶ 4.

54. First, Plaintiff's consultant Kenneth Callahan contacted UnitedHealth in September 2022 about the attempted upload, stating "they were not able to upload the information [i.e., patient roster]" and again "it [i.e., patient roster] wasn't uploaded successfully . . . ." *See* Ex. 18, at 6 (Sept. 23, 2022 email from K. Callahan).

55. Subsequently, another consultant, Frank Vitello, contacted the Agency in December 2022, explaining that on March 17, 2022 "around 285 uninsured claims were submitted to United for temporary ID's by calling the number (888) [sic][2] 569-3522 and United gave them a claim ticket of [sic] number of #D1237."). *See* Ex. 19, at 3 (Dec. 12, 2022 email from F. Vitello).

**b. Uploading a patient roster is not sufficient to submit a claim for reimbursement.**

56. As explained above, the UIP claim submission process includes five steps, and while the patient roster upload step is a necessary prerequisite to submitting a claim, it is not

---

[2] The correct number for the hotline is (866) 569-3522.

sufficient to submit a claim. After a patient roster is successfully uploaded, UnitedHealth assigns temporary patient IDs, which the provider then uses to submit the claim for reimbursement *through an entirely different electronic platform.*

57. The proper procedure for submitting claims is explained in a wealth of materials that were publicly available to Plaintiff. *See, e.g.*, [HRSA COVID-19 - What You Need (linkhealth.com)](linkhealth.com) (providing instructions and access to numerous guidance resources under "Patient Details" and "Claims Reimbursement" tabs).

58. Plaintiff demonstrated its understanding of the proper claim submission process by successfully submitting (and being paid for) 2,308 claims to the UIP prior to its alleged patient roster submission on March 17, 2022.

59. HRSA's record of the 24 batch reference numbers issued to Plaintiff shows that Plaintiff successfully uploaded patient rosters on: May 7, 2020 (BL000000014722); May 8, 2020 (BL000000030917, BL000000030979, BL000000031143, BL000000031265, BL000000031341); May 12, 2020 (BL000000062063, BL000000062108, BL000000062215, BL000000062327, BL000000062422, BL000000063009, BL000000063060, BL000000063087, BL000000063124, BL000000063163, BL000000063312, BL000000063313); May 19, 2020 (BL000000103990, BL000000104019); September 25, 2020 (BL000000869766); April 13, 2021 (BL000003198876); October 7, 2021 (BL000006730928); and February 22, 2022 (BL000010682778). HRSA's records show that Plaintiff's last patient roster upload occurred on February 22, 2022.

60. Again, the successful submission of a patient roster in the UIP Portal results in the immediate generation of a batch load reference number. If the Plaintiff had successfully uploaded a patient roster on March 17, 2022, they would have received (1) the associated batch reference

number; and (2) an auto-generated email confirming the receipt of the patient roster and identifying any patients from the submitted patient roster who already had a temporary ID assigned that had not yet expired.

61. While there is evidence that Plaintiff logged into the UIP Portal on March 17, 2022, there is simply no record that Plaintiff uploaded a patient roster on March 17, 2022.

62. UnitedHealth requested the batch reference number for the attempted March 17, 2022 upload when Plaintiff called the helpline in March 2022, but it was never provided.

63. The "claim ticket" D1237 Plaintiff was issued in response to its call to the provider technical support hotline is entirely different from a batch load reference number. As indicated above, the batch load reference number is an alphanumeric string beginning with "BL" (denoting "batch load"), whereas the claim ticket Plaintiff was issued is merely used as a means of tracking technical issues raised by providers through the hotline.

64. Plaintiff places considerable weight on an April 5, 2022 email, which they attribute to HRSA directly, but which was actually sent by UnitedHealth in its capacity as the Portal technical administrator as indicated by the sender address of "hrsaofflinesupport@uhc.com," rather than an "@hrsa.gov" extension. *See* Ex. A to Sativata Decl., at 1.

65. As the header "**<u>DO NOT REPLY TO THIS EMAIL</u>**" clearly indicates, this message was a general, widely distributed email, not a communication sent specifically to Plaintiff. The April 5, 2022 UnitedHealth email was sent to all providers who had contacted UnitedHealth with questions related to patient rosters; however, the email was only relevant to providers who had successfully uploaded patient rosters and for whom there was a delay in generating temporary patient ID numbers.

66.     Here, it should be noted that while Plaintiff is correct that there was a delay associated with the influx of patient roster submissions in the final days of the claim submission period, this delay only impacted the generation and assignment of temporary patient IDs for submitted patient rosters, and did not impact providers' ability to upload patient rosters.  No other providers reported technical issues uploading patient rosters.  Further, approximately 117,000 patient rosters were successfully uploaded on March 17, 2022.

67.     Plaintiff was included in the distribution of the April 5, 2022 email because it had previously—and incorrectly—identified itself to UnitedHealth as a provider who had successfully submitted a patient roster but had not yet received temporary patient IDs.

68.     The March 23, 2023 UnitedHealth call record associated with "claim ticket" D1237 states Plaintiff "called about *submitted patient roster* on 03/17/22.  Not showing in the dashboard and called daily about member ID so that they can submit the claim before the deadline of 03/22/2022." (emphasis added).  The call record goes on to note "sample patient name not showing in dashboard."  Ex. 20 (Call record).  Had Plaintiff actually uploaded a patient roster on March 17, 2022, the sample patient's name would have been listed in the dashboard.

69.     Regardless of whether Plaintiff was the intended recipient of the April 5, 2022 email, that communication in no way constitutes a confirmation that exceptions would be granted to the deadline or the submission process would be modified for specific providers.  Rather, the April 5, 2022 email clearly states, "As of right now, the program is not accepting new claim submissions for testing and treatment claims, and *currently HRSA is not allowing for any exceptions around the current deadlines. . . .*"  Ex. A to Savitala Decl., at 2 (emphasis added).

70.     Finally, Plaintiff's preliminary injunction filing makes numerous references to "promises of payment" by HRSA.  *See* Pls. PI filing, at 1 ("In reliance on the Defendants' promises

17

of payment,"); 2 ("relying to its detriment on Defendants' promises of payment"), 4 ("the government's promise of reimbursement"); 11 ("promised reimbursement"); 14 ("induced . . . through the promise of payment."); 16 ("Defendants fail to follow through on their promise of payment . . . .").

71. To be clear, HRSA has never promised *any* provider that its UIP claims would be reimbursed, even if timely and correctly submitted, let alone a provider who failed to complete required steps like the submission of patient rosters.

72. Every participating provider was aware that reimbursement was contingent on the availability of funding because every provider must complete a series of attestations each time they upload a batch of patient rosters. Among these attestations, each provider attests that, *"I further understand that reimbursement is subject to available funding for the program."* Ex. 3 (Sample batch upload attestation) (emphasis added).

73. According to HRSA's records, Plaintiff completed 24 attestations on eight separate occasions: On May 7, 2020; May 8, 2020; May 12, 2020; May 19, 2020; September 25, 2020; April 13, 2021; October 7, 2021; and February 22, 2022—the same dates as its prior, successful patient roster uploads.

74. Similar disclaimer language appears on multiple UIP guidance documents, all of which were readily available to Plaintiff. For instance, every page of the UIP webinar PowerPoint from the April 13, 2021 instructional session is emblazoned with the footer: "Reimbursement applies to eligible claims, as determined by HRSA (subject to adjustment as may be necessary), for dates of service or admittance delivered on or after February 4, 2020, *subject to available funding.*" Ex. 8, at 1-33 (UIP webinar PowerPoint) (emphasis added).

75.     The Deadline FAQs published after the announcement of the UIP program shutdown also reminded providers that "[c]laims submitted by the deadline for each category of service will be adjudicated and *paid subject to their eligibility and the availability of funds*." Ex. 13, at 2 (Deadline FAQs) (emphasis added).

Executed this 6th day of September 2023, in Washington, DC.

_____

Alexandra Huttinger