# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SANA HEALTHCARE CARROLLTON, LLC, d/b/a CARROLTON REGIONAL MEDICAL CENTER, | § § § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-738 |
| | § | Judge Mazzant |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | § § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's Application for Preliminary Injunction (Dkt. #6).
Having considered the motion and the relevant pleadings, the Court finds that Plaintiff's
Application for Preliminary Injunction (Dkt. #6) should be **DENIED**.

## BACKGROUND

### I.    Factual History

### A.  The Hospital

This case arises in the context of whether Defendant Health Resources and Services
Administration ("HRSA") properly refused to provide Sana Healthcare Carrollton, LLC (the
"Hospital") with a reimbursement for COVID-19 treatment and testing services to uninsured
patients (Dkt. #1 ¶¶ 1–5). The Hospital operates a 216-bed acute care hospital in Carrollton, Texas
that serves Carrollton, Farmers Branch, Lewisville, the Colony, and other surrounding
communities near Dallas, Texas (Dkt. #1 ¶ 10). The Hospital provided care for patients with

COVID-19, conducted COVID-19 testing, and delivered COVID-19 vaccinations to many members of the communities in and surrounding Dallas (Dkt. #1 ¶ 1).

### B.  The Government

HRSA is a United States government agency to which Defendant United States Department of Health and Human Services ("DHHS") delegated authority to administer certain programs relating to COVID legislation, discussed further below. Defendant Xavier Becerra is the United States Secretary of DHHS (Dkt. #1 ¶ 14). Defendant Carole Johnson is the Administrator of HRSA (Dkt. #1 ¶ 16). The Hospital is only suing Becerra and Johnson in their official capacities (Dkt. #1 ¶¶ 14, 16). The Court refers to the defendants collectively as the "Government."

### C.  Framework of the Uninsured Program

To ensure the availability of COVID-19 testing, treatment, and vaccination for the approximately 29 million Americans without health insurance, Congress appropriated funds to reimburse health care providers for providing these services to the uninsured (Dkt. #14 at pp. 3–4). Congress appropriated initial funds through the Families First Coronavirus Response Act. PUB. L 116-127, 134 STAT. 178 (2020). Subsequently, Congress appropriated additional funds through the Coronavirus, Aid, Relief, and Economic Security Act; the Paycheck Protection Program and Health Care Enhancement Act, and the American Rescue Plan Act of 2021. PUB. L. NO. 116-136, 134 STAT. 281 (2020); PUB. L. 116-139, 134 STAT. 620 (2020); PUB. L. 117-2, 135 STAT. 40 (2021). DHHS has delegated the responsibility for processing claims and making payments to healthcare providers to HRSA (Dkt. #14, Exhibit 1 ¶ 3).

This legislation created and funded the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, and Vaccine Administration for the Uninsured Program (the

"UIP") (Dkt. #14, Exhibit 1 ¶ 3).[1] The UIP provided reimbursement to eligible healthcare providers and facilities for the testing, treatment, and vaccine administration to uninsured individuals (Dkt. #14, Exhibit 1 ¶ 17). HRSA contracted with UnitedHealth Group ("UnitedHealth") to help administer the UIP (Dkt. #14, Exhibit 1 ¶ 18). The UIP existed entirely in an electronic format and required healthcare providers to use two systems, the UIP Portal and the Medicare Electronic Data Interchange ("MEDI") (Dkt. #14, Exhibit 1 ¶ 19). The primary factual disputes in this case relate to the UIP Portal. HRSA has provided various resources to healthcare providers indicating how to use the UIP Portal and MEDI and receive reimbursements under the UIP (*See* Dkt. #14, Exhibits 2–3, 5–14).

### D.  Submitting a Claim Under the Uninsured Program

Although the parties dispute exactly how many steps are required to receive a reimbursement under the UIP, a healthcare provider must clearly complete certain actions to receive a reimbursement (Dkt. #14, Exhibit 1 ¶ 21; Dkt. 16 at p. 8; Dkt. #17 at p. 4 n.2). The most important actions for the purposes of this case were that a healthcare provider must have submitted a patient roster in the UIP Portal and received corresponding temporary patient identification numbers ("temporary IDs") (the healthcare provider would then use the temporary IDs to submit claims for reimbursement using MEDI) (Dkt. #14, Exhibit 1 ¶ 19; Dkt. #14, Exhibit 3 at pp. 18–20, 26; Dkt. #14, Exhibits 4–8; Dkt. #14, Exhibit 9 at p. 16).

To submit a patient roster, a healthcare provider first accessed the UIP Portal (Dkt. 14, Exhibit 1 ¶ 24). The healthcare provider may have submitted the patient information either for individual patients or for multiple patients simultaneously (Dkt. #14, Exhibit 1 ¶ 26). The patient

---

[1] The UIP received funds through the Provider Relief Fund (Dkt. #14 at p. 2).

3

roster must have occurred in the form of a .csv file and complied with certain technical specifications (Dkt. #14, Exhibit 1 ¶ 26; Dkt. #14, Exhibits 5–7). If the healthcare provider attempted to submit a non-conforming patient roster, an error screen would appear indicating that an error occurred in the submission process (Dkt. #14, Exhibit 6). If the healthcare provider successfully uploaded a patient roster, the UIP Portal immediately provided a reference number indicating that the submission was successful (Dkt. #14, Exhibit 7).

On the day following a healthcare provider's successful upload of a patient roster, the provider would receive an automatically generated email (Dkt. #14, Exhibit 1 ¶ 29). The email confirmed the receipt of the patient roster and identified any patients who already had temporary IDs that had not expired (Dkt. #14, Exhibit 8).

After a healthcare provider successfully uploaded a patient roster into the UIP Portal, UnitedHealth analyzed the patient information to verify eligibility (Dkt. #14, Exhibit 1 ¶ 30). Once UnitedHealth verified each patient's eligibility, it assigned a temporary ID to each of the verified patients (Dkt. #14, Exhibit 1 ¶ 30). The process of receiving temporary IDs typically took one to five days after the successful submission of the patient roster (Dkt. #14, Exhibit 1 ¶ 30). The provider could only submit their claims to MEDI after UnitedHealth generated and assigned the temporary IDs (Dkt. #14, Exhibit 1 ¶ 31).

### E.  Impending Shutdown of the Uninsured Program

However, on March 15, 2022, the White House announced the impending shutdown of the UIP due to a lack of sufficient funding (Dkt. #14, Exhibit 1 ¶ 40). HRSA reiterated the White

House's announcement and announced that it would stop accepting testing and treatment claims from providers at 11:59 PM on March 22, 2022 (Dkt. #14, Exhibit 12).[2]

Following the announcement of the UIP's impending shutdown, a "significant increase UIP Portal activity" occurred as healthcare providers sought to submit claims prior to the deadline (Dkt. #17, Exhibit 1 ¶ 10). At that time, UnitedHealth experienced delays in generating temporary IDs for successfully uploaded patient rosters (Dkt. #14, Exhibit 1 ¶ 65). The program manager for the subsidiary of UnitedHealth that managed the UIP claims that the patient roster upload process was separate and distinct from the temporary ID assignment process (Dkt. #17, Exhibit 1 ¶ 10). She further claims that no such delays or technical issues extended to the patient roster upload process (Dkt. #17, Exhibit 1 ¶ 10). UnitedHealth has no record of a technical issue with the UIP Portal that prevented participant providers from uploading patient rosters on March 17, 2023 (Dkt. #17, Exhibit 1 ¶¶ 12–13). On that day, 6,291 providers successfully uploaded 5,503,928 patient records (within 116,627 batches) (Dkt. #17, Exhibit 1 ¶ 9). The UIP Portal assigned each of these March 17 upload batches a reference number (Dkt. #17, Exhibit 1 ¶ 9).

Despite the alleged differences between the two processes, United sent an email addressed to "Provider" on April 5, 2022, to address concerns regarding technical delays (Dkt. #6, Exhibit 3 at p. 3). The email stated in relevant part:

> We are working with HRSA on multiple scenarios that impacted a provider's ability to submit claims by the urgent program shutdown deadlines. As of right now, the program is not accepting new claim submissions for testing and treatment claims, and currently HRSA is not allowing for any exceptions around the current deadlines. If HRSA allows an exception directly related to the provider's scenarios, we will attempt to contact.

---

[2] The Hospital describes the March 22, 2022 deadline as arbitrary (Dkt. #6 at p. 3). However, the Court does not address whether the March 22, 2022 deadline was arbitrary and capricious because the issue before the Court is whether the agency arbitrarily and capriciously refused to reimburse the Hospital for claims that it allegedly submitted on March 17, 2022 (Dkt. #6 at p. 12).

(Dkt. #6, Exhibit 3 at p. 3). The Government claims that UnitedHealth sent this email to all providers who had contacted UnitedHealth with questions related to patient rosters (Dkt. #14, Exhibit 1 ¶ 65). Further, the Government claims that the email was relevant only to providers who had successfully uploaded patient rosters and for whom there was a delay in generating temporary IDs (Dkt. #14, Exhibit 1 ¶ 65).

### F.  The Hospital's Attempted Patient Roster Upload

On March 17, 2022, the Hospital claims that it (specifically the Chief Legal Officer) uploaded a conforming patient roster (consisting of 285 patients) to the UIL portal (Dkt. #6, Exhibit 2 ¶ 4). However, the Hospital claims that it never received temporary IDs before the claim submission deadline passed (Dkt. #6, Exhibit 2 ¶ 6). The Hospital characterizes the April 5, 2022 UnitedHealth email as confirming that the Hospital had uploaded the patient roster on March 17, 2022 (Dkt. #6 at p. 8). The Hospital claims that the "[UIP] portal malfunctioned and resulted in the failure to generate" temporary IDs (Dkt. #6 at p. 12).

The Chief Legal Officer of the Hospital claims that she called UnitedHealth's support line on March 22, 2022, to complain that it had not assigned temporary IDs (Dkt. #6, Exhibit 2 ¶ 7). She claims that "United stated that the system was 'overwhelmed' by the number of claims being submitted, but indicated that that they did see [the Hospital's] March 17, 2022 submission on their end in the system" (Dkt. #6, Exhibit 2 ¶ 7). The Hospital claims that it made daily calls and outreach in the days after its submission (Dkt. #16 at p. 9). However, the Government disputes this claim and states that the first time the Hospital reached out regarding its issue was on March 23, 2022 (Dkt. #14 at p. 12 n.5) (citing Dkt. #14, Exhibit 21). The Government claims that no record exists of the help center agent confirming that the alleged patient roster submission was

visible (Dkt. #14 at p. 12). Instead, the Government claims that the help center agent could not find the patient roster and a sample name that the Hospital had provided (Dkt. #14 at p. 12; Dkt. #14, Exhibit 21). UnitedHealth created a claim ticket #D1237 following one of these two alleged calls (Dkt. #6, Exhibit 2 ¶ 7; Dkt. #14, Exhibit 1 ¶ 68).

In contrast, the Government claims that the Hospital never submitted a patient roster on March 17, 2022 (Dkt. #14 at p. 20). Before this instance, the Hospital had successfully uploaded 24 separate batches of patient information over an approximately two-year timespan (Dkt. #14, Exhibit 1 ¶¶ 45, 59). However, the Government does not have any record indicating that the Hospital submitted a patient roster on March 17, 2022 (Dkt. #17, Exhibit 1 ¶ 13). The Hospital's last patient roster upload into the UIP Portal, according to UnitedHealth's records, occurred on February 22, 2022 (Dkt. #17, Exhibit 1 ¶ 7). A record exists that a Hospital representative logged into the UIP Portal on March 17, 2022 (Dkt. #17, Exhibit 1 ¶ 5). No record of a reference number corresponding to a patient roster upload for the Hospital exists after February 22, 2022 (Dkt. #17, Exhibit 1 ¶¶ 6–7).

The Hospital and HRSA exchanged subsequent correspondence after March 2022 (Dkt. #6, Exhibits 4–5; Dkt. #14, Exhibits 15–20). However, the parties were not able to resolve this dispute in those communications (Dkt. #6, Exhibits 4–5; Dkt. #14, Exhibits 15–20).

## II.    Procedural History

The Hospital brought suit against the Government for declaratory and injunctive relief, claiming that the Government's actions were arbitrary, capricious, and exceeded statutory authority (Dkt. #1 ¶¶ 63–81). The Hospital seeks preliminary and permanent injunctions, where

the preliminary injunction would require the Government to preserve at least $6.5 million in the UIP to prevent the funds from being exhausted (Dkt. #1 ¶¶ 82–90).

On August 16, 2023, the Hospital filed the present motion requesting that the Court issue a preliminary injunction requiring the Government to "set aside, obligate, or deposit into the Court's Registry sufficient funds to reimburse $6,419,414 in gross charges from remaining [Provider Relief Fund] funds, or funds recouped from [Provider Relief Fund] overpayments to providers" (Dkt. #6 at p. 16). The Government timely filed its response (Dkt. #14). The Hospital timely filed its reply (Dkt. #16). The Government timely filed its sur-reply (Dkt. #17).

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove its case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

8

## ANALYSIS

First, the Court addresses whether HRSA's decision not to reimburse the Hospital for providing services to uninsured persons is reviewable under the Administrative Procedure Act. Then, the Court only considers the factor of whether a substantial likelihood of success on the merits exists because that factor is dispositive. Further, no findings in this order will bind either party in a motion for summary judgment or at trial. *Univ. of Tex.*, 451 U.S. at 395.

### I.      Reviewability under the Administrative Procedure Act

The Court has the power to review the Government's decision not to reimburse the Hospital under the Administrative Procedure Act (the "APA"). A "strong presumption [exists] favoring judicial review of administrative action." *Salinas v. U.S.R.R. Ret. Bd.*, 592 U.S. 188. 197 (2021) (quoting *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015). Judicial review under the APA does not extend to "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). However, this narrow discretion exception "'may be invoked only upon a clear and convincing showing that to do so would further the intent of Congress.'" *MCorp v. Clarke*, 755 F. Supp. 1402, 1410 (N.D. Tex. 1991) (quoting *Ashton v. Pierce*, 541 F. Supp. 635, 643 (D.D.C.1982)). This exception only applies "where the substantive statute left the courts with 'no law to apply.'" *Heckler v. Chaney*, 470 U.S. 821, 826 (1985).

The Government argues that the Court cannot review its decision not to reimburse the Hospital under the APA because it was an agency action committed to agency discretion by law (Dkt. #14 at pp. 17–18). The Government claims that the D.C. District Court's recent decision in *Hospital for Special Surgery v. Becerra* is instructive (Dkt. #14 at pp. 17–18). No. 22-2928 (JDB), 2023 WL 5448017 (D.D.C. Aug. 24, 2023). In *Hospital for Special Surgery*, the plaintiff challenged

HRSA's methodology to distribute funds to healthcare providers under Phase 3 of the Provider Relief Fund. *Id.* at *3. However, the court determined that HRSA's decided methodology did not relate to the statutory standards in the Coronavirus, Aid, Relief, and Economic Security Act governing provision of the funds. *Id.* at *7. Therefore, the court determined "there is no law to apply" in evaluating how HRSA decided its methodology to distribute funds from the Provider Relief Fund. *Id.* Thus, the court found that HRSA's decided methodology was an agency decision committed to agency discretion by law and not reviewable. *Id.*

Based on *Hospital for Special Surgery*, the Government claims that the Court cannot review its decision to not reimburse the Hospital (Dkt. #14 at p. 18). "The appropriations to HRSA to provide reimbursement to healthcare providers . . . were lump-sum appropriations" (Dkt. #14 at p. 18). "Congress placed minimal guardrails on HHS' discretion: the funds are to be distributed to defined health care providers for testing, treatment, and/or vaccination of uninsured individuals" (Dkt. #14 at p. 18). Therefore, according to the Government, its decision to not reimburse the Hospital is not reviewable by the Court because it was an agency action committed to agency discretion by law (Dkt. #14 at pp. 17–18).

In response, the Hospital argues that the Government has not met its burden to show that the agency action to not reimburse the Hospital is not reviewable (Dkt. #16 at pp. 5–7). Unlike *Hospital for Special Surgery*, the Hospital is not challenging the Government's reimbursement methodology (Dkt. #16 at p. 7). Instead, the Hospital seeks judicial review of the Government's decision not to reimburse the Hospital "for claims related to patient claims data that it timely submitted before the abrupt program shutdown deadline . . . " (Dkt. #16 at p. 7).

Contrary to the Government's argument, its decision to not reimburse the Hospital is reviewable by the Court because its decision allegedly violates the Government's own policies. "'[E]ven if the substance of an agency's decision is beyond review as discretionary, an agency's failure to follow its own regulations may be challenged under the APA.'" *Patterson v. Def POW/MIA Acct. Agency*, 343 F. Supp. 3d 637, 650 (W.D. Tex. 2018) (quoting *Ellison v. Connor*, 153 F.3d 247, 252 (5th Cir. 1998)).[3] The Government (particularly HRSA) has released detailed policies and information related to the submission of claims for reimbursement through the UIP Portal and MEDI pursuant to the UIP (*See* Dkt. #14, Exhibits 2–3, 5–14). Even assuming the underlying legislation commits the Government's decision whether to reimburse healthcare providers to its own discretion, these policies provide the Court with sufficient standards to evaluate the Government's action (*See* Dkt. #14, Exhibits 2–3, 5–14). Therefore, the Cort finds that APA review is available for the Hospital's claims.

## II.     Substantial Likelihood of Success on the Merits

The Hospital has not demonstrated a substantial likelihood of success on the merits. To satisfy this element, the Hospital is "not required to prove [their] entitlement to summary judgment." *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009). Certainty of success is not the standard—substantial likelihood is, which means that success on the merits must be "considerably more likely" than not. *United States v. Thorn*, 317 F.3d 107, 117 (2d Cir. 2003). To make this determination, the Court looks to the standards for the causes of action pleaded as provided by substantive law. *Sepulvado v. Jindal*, 729 F.3d 413, 418 (5th Cir. 2013).

---

[3] Judicial review of an agency's failure to follow its own regulations extends beyond violations of regulations within the Code of Federal Regulations. *See id.* at 651. Rather, judicial review may still occur where an agency violates its own detailed policies that provide sufficient standards by which to evaluate the agency's actions. *See id.*

A reviewing court must "hold unlawful and set aside [an] agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). A court's "role is to determine whether the agency's decision 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Huawei Tech. USA, Inc. v. Fed. Commc'n Comm'n*, 2 F.4th 421, 434 (5th Cir. 2021) (quoting *Sierra Club v. U.S. Env't Prot. Agency*, 939 F.3d 649, 664 (5th Cir. 2019)). "Agencies 'are required to engage in reasoned decision making.'" *Id.* at 433 (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015)). "'Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational. *Id.* at 433–34 (quoting Michigan, 576 U.S. at 750). "The agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* at 434 (quoting *Sierra Club*, 939 F.3d at 664). "However, [a court] cannot substitute [its] judgment for that of the agency.'" *Id.* (quoting *Sierra Club*, 939 F.3d at 664).

The Hospital makes two arguments regarding its likelihood of success on the merits. First, the Hospital claims that the Government did not provide a reimbursement for $6,419,414 in gross charges for pandemic-related services the Hospital provided because of the UIP Portal's error and UnitedHealth's failure to generate temporary IDs (Dkt. #6 at p. 12). Second, the Hospital claims that even if its error caused its inability to submit claims, it was an abuse of discretion for the Government to not allow the Hospital to correct that error (Dkt. #16 at pp. 11–13).

### A.  Whether the Hospital Properly Submitted Its Patient Roster

The Hospital claims that the Government "failed to reasonably consider the relevant issues and to reasonably explain its unwarranted denial of promised reimbursement for $6,419,414 in gross charges for pandemic-related services rendered by the Hospital" (Dkt. #6 at p. 12). "The [Government] failed to account for the crucial fact that its own website portal malfunctioned and resulted in the failure to generate [temporary IDs]" (Dkt. #6 at p. 12). "'[The April 5, 2022] email shows that the agency acknowledged that its malfunctioning portal created 'multiple scenarios that impacted a provider's ability to submit claims by the urgent program shutdown deadlines'" (Dkt. #6 at p. 12). However, according to the Hospital, the Government has erroneously claimed that it has no evidence of any technical error that would have impeded Sana from uploading a patient roster on March 17, 2022 (Dkt. #6 at p. 12).

In support of its argument, the Hospital directs the Court to *Tyler Regional Hospital, LLC v. Department of Health and Human Services*. No. 6:23-CV-134, 2023 WL 3506471 (E.D. Tex. May 17, 2023). In *Tyler Regional Hospital*, the plaintiffs challenged DHHS's policy on accepting revisions to a provider's tax-identification number ("TIN") after the application deadline *Id.* at *2. The plaintiffs sought to receive lost revenue attributable to COVID-19 under the American Rescue Plan Rural program. *Id.* The plaintiffs had mistyped the TIN for a subsidiary hospital in its application, and the subsidiary hospital then did not receive any allocated funds. *Id.* at 4. A few days after this erroneous submission, the electronic portal displayed a green check mark next to the "Validate TIN" field of the plaintiffs' application. *Id.* Later, the plaintiffs asked to correct the error so that HRSA could process the payment. *Id.* at 5. HRSA refused to allow the correction as part of its blanket policy to refuse revisions to applications after their submission. *Id.* However, the

Case 4:23-cv-00738-ALM   Document 20   Filed 12/19/23   Page 14 of 19 PageID #:   383

plaintiffs (and applicants in general) received ambiguous information as to whether the agency would screen TINs before an application on the portal was complete (i.e., before the green check mark would appear). *Id.* at 3. The court held that the plaintiffs did not have fair notice that an error might be held against them after understanding the green check mark gave them the "green light to proceed with the TIN data entered." *Id.* at *7. Further, the agency could have corrected this clerical error with minimal effort because it had various dealings with the subsidiary hospital using its correct TIN and had a system to verify providers' TINs. *Id.* Therefore, the agency's actions were arbitrary and capricious. *Id.* at *8.

In response, the Government claims that it did not provide reimbursement to the Hospital because the Hospital did not upload its patient roster on March 17, 2022 (Dkt. #14 at pp. 18–22). The Government points out that it has no record of the Hospital submitting its patient roster, the system did not automatically provide a reference number, and the Hospital has not produced the automated email that it should have received (Dkt. #14 at pp. 19–20; Dkt. #17 at pp. 2–3). Additionally, the government claims that no technical issues impacted any providers' ability to submit patient rosters via the UIP Portal (Dkt. #17 at pp. 2–3). Further, the Government argues that it has consistently told the Hospital that no record exists of its alleged March 17, 2022 patient roster upload (Dkt. #14 at pp. 21–22). Finally, the Government claims that *Tyler Regional Hospital* is not analogous to this case because no comparable ambiguity exists, and clerical errors do not lay at the heart of the dispute in this case (Dkt. #14 at p. 22).

*Tyler Regional Hospital* is not factually and legally analogous to this case because the primary two rationales underlying the court's decision do not apply to this case. First, a key aspect of *Tyler Regional Hospital* was that the plaintiffs submitted their TINs online and that portion of their

application appeared complete and verified based on the presence of a green check mark. 2023 WL 3506471, at *4, 7. However, the fair notice rationale is not applicable in this case because multiple pieces of undisputed evidence demonstrate the Hospital did not receive any indication that it successfully uploaded its patient roster on March 17, 2022. Specifically, the Hospital has not produced the corresponding temporary IDs, automatically generated email, or automatically generated reference number (Dkt. #6, Exhibit 2 ¶ 6; Dkt. #17, Exhibit 1 ¶¶ 6–7).[4]

Second, the Government (more specifically HRSA or UnitedHealth) could not have located or determined the Hospital's patient roster with minimal effort. In *Tyler Regional Hospital*, HRSA could have easily determined the subsidiary hospital's correct TIN from either its past records relating to the hospital or through its system to verify TINs. 2023 WL 3506471, at *7. No evidence in the record suggests that the Government could have obtained this information with minimal effort.

The Hospital has not demonstrated that it either likely successfully uploaded its patient roster on March 17, 2022, or that technical issues with the UIP Portal (or any related system) likely prevented the upload. The evidence that the patient roster was not successfully uploaded includes: (1) the Hospital's lack of production of an automatically generated email, (2) the lack of an automatically generated reference number, (3) the Hospital never received corresponding temporary IDs, and (4) the lack of a record of a patient roster by the Hospital on March 17, 2022 even though records exist indicating a Hospital representative logged into the UIP Portal on that

---

[4] Although the alleged March 22, 2022 call where the help center agent claimed to have been able to see the patient roster upload could be viewed as supporting evidence, the veracity of this evidence is disputed (Dkt. #6, Exhibit 2 ¶ 7; Dkt. #14 at p. 12; Dkt. #14, Exhibit 21). Similarly, the April 5, 2022 email can be interpreted as supporting the Hospital's claim that technical issues occurred but does not necessarily demonstrate that the Hospital successfully uploaded its patient roster on March 17, 2022 (Dkt. #6, Exhibit 3 at p. 3; Dkt. #14, Exhibit 1 ¶ 65).

date (Dkt. #6, Exhibit 2 ¶ 6; Dkt. #17, Exhibit 1 ¶¶ 6–7). Although the Hospital has produced evidence that the technical issues occurred relating to the UIP program, it has not produced evidence specifically showing that these technical issues impacted a providers' ability to upload a patient roster (Dkt. #6, Exhibit 2 ¶ 7; Dkt. #6, Exhibit 3). Rather, the Government has produced evidence that these technical issues did not extend to a providers' ability to upload a patient roster (Dkt. #17, Exhibit 1 ¶¶ 12–13).

The Court does not find that the Government acted arbitrarily and capriciously by not providing a reimbursement to the Hospital because the Hospital likely did not submit its patient roster on March 17, 2022.

### B.  Whether the Hospital is Entitled to Correct Any Mistake It Made

The Hospital argues that "it was an abuse of discretion for [the Government] to not allow the Hospital to resubmit its patient roster," regardless of whether the Hospital's error caused its inability to submit claims (Dkt. #16 at pp. 11–13). Akin to *Tyler Regional Hospital*, according to the Hospital, "the guidance materials submitted by [the Government] do not state who is responsible in the event of a portal malfunction or error in the patient roster submission process" (Dkt. #16 at pp. 12–13). Therefore, "[i]t was arbitrary and capricious for [the Government] not to allow the Hospital to correct the error" (Dkt. #16 at p. 12).

In response, the Government claims that the Hospital is not entitled to correct the error regardless of which party was at fault (Dkt. #17 at pp. 4–5). According to the Government, "[a] necessary step was submitting a patient roster through the UIP Portal and having [temporary IDs] assigned to eligible patients" (Dkt. #17 at p. 4). Because of "its own failure" to complete this step, the Government claims the Hospital "cannot succeed on the merits of its claim" (Dkt. #17 at p. 4).

Further, the Government claims "it was not arbitrary nor capricious for HRSA to set, and stick to, a deadline for submitting claims and to reject claims submitted after that deadline" (Dkt. #17 at p. 4).

Additionally, the Government argues that *Tyler Regional Hospital* does not support the Hospital's argument for two reasons (Dkt. #17 at pp. 4–5). First, no similar ambiguity occurs in this case because the providers were simply required to submit patient information (Dkt. #17 at p. 5). Second, *Tyler Regional Hospital* involved an actually submitted application for the Provider Relief Fund, while this case has never involved a completed application (Dkt. #17 at p. 5).

*Tyler Regional Hospital* does not support the Hospital's argument. That case involved a completed application that contained an error where the court considered whether HRSA may strictly construe the error against the provider. *Tyler Regional Hospital*, 2023 WL 3506471, at *6– 8. The question before the court was whether, considering HRSA's ambiguous policies, the agency must provide fair notice before it strictly holds that error against the party despite the appearance that the relevant step has been successfully completed. *See id.* Fair notice was an issue only because the provider seemed to have successfully completed the relevant part of the application, but HRSA later rejected the application due to a typographical error. *See id.* at *7.

However, in this case, the Hospital likely did not submit its patient roster. In the absence of the appearance of a successfully submitted patient roster, the Hospital would have no reason to believe that it had successfully completed its application for reimbursement (*See* Dkt. #14, Exhibit 1 ¶ 26; Dkt. #14, Exhibits 5–8).[5] Assuming the patient roster upload process was working properly, no issue of fair notice exists because the Hospital did not receive indications that it had successfully

---

[5] If the Hospital shows that its successfully submitted its patient roster and the Government did not produce the corresponding temporary IDs, the Court's analysis would likely reach a different result.

uploaded its patient roster on March 17, 2022 (Dkt. #6, Exhibit 2 ¶ 6; Dkt. #17, Exhibit 1 ¶¶ 6–7). *Tyler Regional Hospital*, 2023 WL 3506471, at *7.[6].

Other than *Tyler Regional Hospital*, the Hospital has provided no authority in support of its argument (Dkt. #16 at pp. 12–13). The Court cannot find such a source supporting the Hospital's argument based on fair notice where a party had never submitted an application. If the Hospital never submitted its patient roster through its own fault, the Government did not have an obligation to allow the Hospital to correct its error after the March 22, 2022 deadline. Further, the parties have not presented any facts suggesting that the Hospital could not have reattempted to upload its patient roster before the passage of the deadline. The Court does not find that the Government acted arbitrarily and capriciously by not allowing the Hospital to reattempt to submit its patient roster from March 22, 2022.

The Hospital has not shown that it is considerably more likely than not that it will succeed on the merits of its claims. Therefore, the Hospital has not demonstrated a substantial likelihood of success on the merits. The Court will not grant the Hospital's application for a preliminary injunction.

---

[6] The Court's analysis may vary if the Hospital can demonstrate that the patient roster upload process did not work successfully on March 17, 2022. The Hospital has not produced specific evidence indicating that the patient roster upload did not work properly on that date (*See* Dkt. #6, Exhibit 2 ¶ 7; Dkt. #6, Exhibit 3). However, the Government has produced evidence indicating that the patient roster upload process worked properly on that date (Dkt. #17, Exhibit 1 ¶¶ 12–13).

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Application for Preliminary Injunction (Dkt. #6)

is hereby **DENIED.**

**IT IS SO ORDERED.**

**SIGNED this 19th day of December, 2023.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE