# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| SANA HEALTHCARE CARROLLTON, d/b/a CARROLLTON REGIONAL MEDICAL CENTER, | § § § § | |
| *Plaintiff,* | § § | |
| v. | § § § | Civil Action No. 4:23-cv-738 Judge Mazzant |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.,* | § § § | |
| *Defendants.* | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiff's Motion for Summary Judgment and Brief in Support (Dkt. #45) and Defendants' Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment (Dkt. #49). Having considered the Motions the relevant pleadings, and the applicable law, the Court finds that Plaintiff's Motion for Summary Judgment and Brief in Support (Dkt. #45) should be **DENIED** and Defendants' Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment (Dkt. #49) should be **GRANTED**.

## BACKGROUND

### I.    Factual Background

### A.    The Parties

This case concerns whether Defendant Health Resources and Services Administration ("HRSA") properly refused to provide Sana Healthcare Carrollton, LLC (the "Hospital") with a reimbursement for COVID-19 treatment and testing services to uninsured patients (Dkt. #1 at ¶¶

1–5). The Hospital provided care for patients with COVID-19, conducted COVID-19 testing, and delivered COVID-19 vaccinations to many members of the communities in and around Dallas, TX (Dkt. #1 at ¶ 1). HRSA is a United States government agency to which Defendant United States Department of Health and Human Services ("DHHS") delegated authority to administer certain programs relating to COVID-19 legislation, discussed further below (Dkt. #1 at ¶ 15). At the time, Defendant Xavier Becerra was the United States Secretary of DHHS and Defendant Carole Johnson was the Administrator of HRSA (Dkt. #1 at ¶¶ 14, 16). The Court refers to Defendants collectively as the "Agency."

B.     **Framework of the Uninsured Program**

To ensure the availability of COVID-19 testing, treatment, and vaccination for the approximately 29 million Americans without health insurance, Congress appropriated funds to reimburse health care providers for providing these services to the uninsured (Dkt. #14 at pp. 3–4). Congress appropriated initial funds through the Families First Coronavirus Response Act. Pub. L. No. 116-127, 134 Stat. 178 (2020). Subsequently, Congress appropriated additional funds through the Coronavirus, Aid, Relief, and Economic Security Act; the Paycheck Protection Program and Health Care Enhancement Act, and the American Rescue Plan Act of 2021. Pub. L. No. 116–136, 134 Stat. 281 (2020); Pub. L. No. 116–139, 134 Stat. 620 (2020); Pub. L. No. 117–2, 135 Stat. 4 (2021). HRSA is responsible for processing claims and making payments to healthcare providers (Dkt. #14-1 at ¶ 3).

This legislation created and funded the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, and Vaccine Administration for the Uninsured Program (the "UIP") (Dkt. #14-1 at ¶ 3). The UIP provided reimbursements to eligible healthcare providers and facilities for the testing, treatment, and vaccine administration to uninsured individuals (Dkt. #14-1

2

at ¶ 17). HRSA contracted with UnitedHealth Group ("UnitedHealth") to help administer the UIP (Dkt. #14-1 at ¶ 18). The UIP existed entirely in an electronic format and required healthcare providers to use two systems, the UIP Portal and the Medicare Electronic Data Interchange ("MEDI") (Dkt. #14-1 at ¶ 19). The primary factual disputes in this case relate to the UIP Portal. HRSA has provided various resources to healthcare providers indicating how to use the UIP Portal and MEDI and receive reimbursements under the UIP (*See e.g.*, Dkt. #14-2; Dkt. #14-3; Dkt. #14-5).

### C.    Submitting a Claim Under the Uninsured Program

The reimbursement model, regularly referred to as the Uninsured Program Participation in the UIP, is accomplished via two systems and involves five steps (Dkt. #14-1 at ¶¶ 21–32).

Step One utilizes the "UIP Portal" to enroll into the program. The provider will submit its Taxpayer Identification Number, a roster of the doctors or other professionals who will provide the reimbursable services or treatment, and banking information so that funds can be disbursed (Dkt. #14-1 at ¶¶ 22–23).

At Step Two, the provider submits patient information through the UIP Portal including a patient's name, date of birth, Social Security Number, and the date services were provided or when the patient was admitted for care (Dkt. #14-1 at ¶ 24; Dkt. #14-5). A provider can submit patient information one at a time or in batches (Dkt. #14-1 at ¶ 26). The patient roster must have occurred in the form of a ".csv" file and complied with certain technical specifications (Dkt. #14-1 at ¶ 26; Dkt. #14-5; Dkt. #14-6). If the healthcare provider attempted to submit a non-conforming patient roster, an error screen would appear indicating that an error occurred in the submission process (Dkt. #14-6). If the healthcare provider successfully uploaded a patient roster, the UIP Portal immediately provided a reference number indicating that the submission was successful (Dkt. #14-

7). In addition to the on-screen message, if a user has successfully submitted a patient roster, the provider will also receive an auto-generated email that confirms the receipt of the patient roster (Dkt. #14-1 at ¶ 29). Additionally, UnitedHealth maintains records of the batch load reference numbers assigned to each patient roster submission (Dkt. #49 at p. 7).

During Step Three, UnitedHealth verifies the patient eligibility of each eligible patient included in the patient roster submission and assigns unique patient identification numbers ("temporary IDs") (Dkt. #14-1 at ¶ 30). At Step Four, the provider utilizes MEDI to submit claims for reimbursement (Dkt. #14-1 at ¶ 31). Step Five is the validation, adjudication, and payment of each claim (Dkt. #14-1 at ¶ 32). Here, HRSA evaluates the claim and makes a payment to the provider (Dkt. #14-1 at ¶ 32).

### D.    Impending Shutdown of the Uninsured Program

On March 15, 2022, the White House announced the impending shutdown of the UIP due to insufficient funding (Dkt. #14-1 at ¶ 40). HRSA reiterated the White House's announcement and stated that it would stop accepting testing and treatment claims from providers at 11:59 PM on March 22, 2022 (Dkt. #14-12).

Following the announcement of the UIP's impending shutdown, a "significant increase in UIP Portal activity" occurred as healthcare providers sought to submit claims prior to the deadline (Dkt. #17-1 at ¶ 10). At that time, UnitedHealth experienced delays in generating temporary IDs for successfully uploaded patient rosters (*See* Dkt. #14-1 at ¶ 65). The program manager for the subsidiary of UnitedHealth that managed the UIP claims that the patient roster upload process was separate and distinct from the temporary ID assignment process (Dkt. #17-1 at ¶ 10). She further claims that no delays or technical issues extended to the patient roster upload process (Dkt. #17-1 at ¶ 10). UnitedHealth has no record of a technical issue with the UIP Portal that prevented

4

participant providers from uploading patient rosters on March 17, 2022 (Dkt. #17-1 at ¶¶ 12–13). On that day, 6,291 providers successfully uploaded 5,503,928 patient records (within 116,627 batches) (Dkt. #17-1 at ¶ 9). The UIP Portal assigned each of these March 17 upload batches a reference number (Dkt. #17-1 at ¶ 9).

UnitedHealth sent an email addressed to "Provider"[1] on April 5, 2022, to address concerns regarding technical delays (Dkt. #6-3 at p. 3). The email stated in relevant part:

> We are working with HRSA on multiple scenarios that impacted a provider's ability to submit claims by the urgent program shutdown deadlines. As of right now, the program is not accepting new claim submissions for testing and treatment claims, and currently HRSA is not allowing for any exceptions around the current deadlines. If HRSA allows an exception directly related to the provider's scenarios, we will attempt to contact.

(Dkt. #6-3 at p. 3).

The Agency claims that UnitedHealth sent this email to all providers who had contacted UnitedHealth with questions related to patient rosters (Dkt. #14-1 at ¶ 65). Further, the Agency claims that the email was relevant only to providers who had successfully uploaded patient rosters and for whom there was a delay in generating temporary IDs (Dkt. #14-1 at ¶ 65).

### E.    The Hospital's Attempted Patient Roster Upload

On March 17, 2022, the Hospital claims that its Chief Legal Officer uploaded a conforming patient roster consisting of 285 patients, to the UIP Portal (Dkt. #6-2 at ¶ 4). However, the Hospital claims that it never received temporary IDs before the claim submission deadline (Dkt. #6-2 at ¶ 6). The Hospital characterizes the April 5, 2022 UnitedHealth email as confirming that the Hospital had uploaded the patient roster on March 17, 2022 (*See* Dkt. #6 at p. 8). The Hospital claims that

---

[1] On April 5, 2022, UnitedHealth sent a general email to healthcare providers regarding the patient roster verification process (Dkt. #45-5 at p. 471). The email used the term "Provider" to refer to the recipient of the email.

the "[UIP] portal malfunctioned and resulted in the failure to generate" temporary IDs (Dkt. #6 at p. 12).

The Chief Legal Officer of the Hospital claims that she called UnitedHealth's support line on March 22, 2022, to complain that it had not assigned temporary IDs (Dkt. #6-2 at ¶ 7). She claims that "United stated that the system was 'overwhelmed' by the number of claims being submitted, but indicated that that they did see [the Hospital's] March 17, 2022 submission on their end in the system" (Dkt. #6-2 at ¶ 7). The Hospital claims that it made daily calls and outreach in the days after its submission (Dkt. #16 at p. 9). However, the Agency disputes this claim and states that the first time the Hospital reached out regarding its issue was on March 23, 2022 (Dkt. #14 at p. 12 n.5). The Agency claims that no record exists of the help center agent confirming that the alleged patient roster submission was visible (Dkt. #14 at p. 12). Instead, the Agency claims that the help center agent could not find the patient roster and a sample name that the Hospital had provided (Dkt. #14 at p. 12; Dkt. #14-21). UnitedHealth created a claim ticket #D1237 following one of these two alleged calls (Dkt. #6-2 at ¶ 7; Dkt. #14-1 at ¶ 68).

In contrast, the Agency claims that the Hospital never submitted a patient roster on March 17, 2022 (Dkt. #14 at p. 20). Before this instance, the Hospital had successfully uploaded 24 separate batches of patient information over an approximately two-year timespan (Dkt. #14-1 at ¶¶ 45, 59). However, the Agency does not have any record indicating that the Hospital submitted a patient roster on March 17, 2022 (Dkt. #17-1 at ¶ 13). The Hospital's last patient roster upload into the UIP Portal, according to UnitedHealth's records, occurred on February 22, 2022 (Dkt. #17-1 at ¶ 7). A record exists that a Hospital representative logged into the UIP Portal on March 17, 2022 (Dkt. #17-1 at ¶ 5). No record of a reference number corresponding to a patient

roster upload for the Hospital exists after February 22, 2022 (Dkt. #17-1 at ¶¶ 6–7). The Hospital and HRSA exchanged subsequent correspondence after March 2022 (Dkt. #45-5 at pp. 461–495). However, the parties could not resolve this dispute in those communications (*See* Dkt. #45-5 at pp. 461–95).

## II.    Procedural History

On August 10, 2023, the Hospital filed suit, claiming that the Agency's actions were arbitrary, capricious, and exceeded statutory authority (Dkt. #1 at ¶¶ 63–81). Plaintiff then filed a Motion for Preliminary Injunction on August 16, 2023 (Dkt. #6). On December 19, 2023, the Court denied Plaintiff's Motion (Dkt. #20).

On September 16, 2024, Plaintiff filed a Motion for Summary Judgment (Dkt. #45). On October 16, 2024, Defendants filed their Response to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment (Dkt. #49). Then, the Hospital filed its Reply on November 15, 2024 (Dkt. #50) and on December 6, 2024, Defendants filed its Sur-Reply (Dkt. #53).[2]

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Cases challenging an agency decision under the Administrative Procedures Act ("APA") "are often resolved at summary judgment because whether an agency's decision is arbitrary and capricious is a legal question that the court can

---

[2]    Plaintiff's filing is titled "Reply in Further Support of its Motion for Summary Judgment and In Opposition to Defendants' Cross-Motion for Summary Judgment" (Dkt. #50), which the Court refers to as its Reply for simplicity. Relatedly, Defendants' subsequent filing is titled "Reply in Support of Cross-Motion for Summary Judgment" (Dkt. #53) which the Court refers to as their Sur-Reply for simplicity.

usually resolve on the agency record." *Armin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022); *see also Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006) (noting that the district court functions as "a reviewing court" exercising a "narrowly defined duty of holding agencies to certain minimal standards of rationality"); *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 441 n.3 (D.C. Cir. 1999) (explaining that in challenges under the APA, the district court "sits as an appellate tribunal" resolving, based on the agency record, whether the agency acted in an arbitrary and capricious manner). In reviewing an agency's decision, the court considers whether the action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Brown v. Napolitano*, 391 F. App'x 346, 349 (5th Cir. 2010). An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Tex. Oil & Gas Ass'n v. U.S. E.P.A.*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins.*, 463 U.S. 29, 43 (1983)). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43.

To prevail on its APA challenge, the plaintiff must demonstrate that the agency's finding was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* The plaintiff must show "not only that the evidence supports a contrary decision, but . . . that the evidence *compels* it." *Id.* (emphasis in original). The plaintiff bears the burden and the standard it must meet is "demanding." *Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*, 894 F.3d 692,

697 (5th Cir. 2018). "'The arbitrary and capricious standard is 'highly deferential,' and we must afford the agency's decision 'a presumption of regularity.'" *Ghedi v. Mayorkas*, 16 F.4th 456, 468 (5th Cir. 2021). However, while the court affords deference to an agency's decision, the court can "disregard the agency's finding when it ignores relevant evidence without explaining and justifying its decision to do so." *N.L.R.B. v. E-Sys., Inc., Garland Div.*, 103 F.3d 435, 439 (5th Cir. 1997).

## ANALYSIS

Here, based on the Administrative Record, the Court must decide whether the Agency's decisions not to reimburse the Hospital and not to extend the claim submission deadline were arbitrary and capricious. The Hospital argues that the Agency's decisions were arbitrary and capricious for three reasons: (1) the Agency failed to consider technical issues with the UIP Portal that prevented patient roster submissions near the program shutdown deadline (Dkt. #45 at p. 18); (2) the Agency did not to extend the uninsured program shutdown deadline in light of the technical issues with the UIP Portal (Dkt. #45 at p. 22); (3) the Agency abruptly changed course and ignored the Hospital's reliance interests (Dkt. #45 at p. 23). The Court examined the full Administrative Record and considered all of the parties' arguments. The Court concludes that the Agency's actions were *not* arbitrary and capricious. Therefore, Defendants are entitled to summary judgment on all claims.

## I.    The Agency's Decision to Deny the Hospital's Reimbursement Claim

Under the Administrative Procedure Act, the Court reviews the Agency's actions based on the reasons it gave when it acted. *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 189 (5th Cir. 2023) (citation modified). An agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (citation modified). An agency's decision

9

is arbitrary and capricious if it "relies on improper factors, fails to consider key information, offers a decision that the record does not support, or lacks plausibility." *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 190 (5th Cir. 2024). Here, the Agency examined relevant data, including:

1. The Hospital's inability to produce an automatically generated confirmation email (Dkt. #45-5 at p. 448);

2. The Hospital's inability to produce a generated reference number (Dkt. #45-5 at p. 448);

3. The high volume of successfully submitted patient rosters from other institutions (Dkt. #17-1 at ¶ 9);

4. The April 5, 2022 email from the Agency informing providers that the Agency was "working with HRSA on multiple scenarios that impacted a provider's ability to submit claims" (Dkt. #6-3 at pp. 2–3);

5. The lack of a record of a patient roster by the Hospital on March 17, 2022, even though records exist indicating a Hospital representative logged into the UIP Portal on that date (Dkt. #6-2 at ¶ 6; Dkt. #17-1 at ¶¶ 6–7);

6. The lack of similarly situated providers (Dkt. #45-6 at pp. 6–75; Dkt. #49 at p. 24).

The Hospital argues that technical errors with the UIP Portal experienced by multiple users was an important aspect of the problem (*See* Dkt. #45 at p. 14). The Hospital claims, therefore, that the Agency's failure to investigate or consider whether these technical errors impacted the Hospital's submission was arbitrary and capricious. (Dkt. #45 at pp. 14–16). The Court disagrees. The Court finds that the Agency examined relevant data and articulated a satisfactory explanation for its actions including a rational connection between the facts found and the choices made.

A.    **Technical Errors Impacting the Hospital's Submission**

The Administrative Record does not support the claim that technical errors prevented the Hospital from successfully submitting its patient roster. The Hospital is unable to produce any

automated submission confirmation to evidence its submission, nor can the Hospital produce an email confirmation (*See* Dkt. #45-5 at pp. 466–71). Additionally, while the UIP Portal shows multiple successful submissions by the Hospital in the past, it does not show any record of a submission or an attempted submission on March 17, 2022 (Dkt. #45-5; Dkt. #49 at pp. 9–10). Further, the Agency received 5,503,928 successfully uploaded patient records, without any indication, that other users experienced the same alleged issue as the Hospital (Dkt. #17-1 at ¶ 9).

The Hospital relies on Radha Savilata's ("Savilata") declaration to argue that technical difficulties prevented the Hospital from submitting its patient roster (Dkt. #45 at pp. 9–10). However, this declaration is inconsistent with the Administrative Record. A key component of the declaration is the phone call to the Agency's support team to confirm the hospital's submission. (Dkt #1-1 at pp. 3–4) The declaration states the call occurred on March 22, 2022, which would make the call occur before the claim submission deadline (Dkt. #1-1 at p. 2). If true, this would benefit the Hospital by demonstrating that the Hospital's attempted to resolve the issue over the phone before the deadline (*See* Dkt. #45 at p. 15). However, the Agency's call log does not support this claim (Dkt. #14-21). The call data shows that the conversation did not occur until after the claim submission deadline (Dkt. #14-21). Additionally, the Court finds no record of a phone call occurring before March 23, 2022. At the time of the Agency's decision to reject the Hospital's claim, the relevant data in the Administrative Record better supports the conclusion that the Hospital did not complete Step Two of the claim submission process. The Agency's decision to reject the Hospital's claims in light of this significant support does not rise to the high standard required to be considered arbitrary and capricious. *See Sw. Electric Power Co. v. U.S. Env't Prot. Agency*, 920 F.3d 999, 1013 (5th Cir. 2019).

### B.    Technical Errors Impacting Other Provider's Claims

The call records from other providers do not support the Hospital's allegation that multiple healthcare providers experienced the same issue uploading their patient rosters. The Hospital relies on the claim that multiple other users experienced the same issues as the Hospital (Dkt #45 at pp. 13–16); however, the Administrative Record does not support that claim. The Hospital reviewed calls from four other callers who experienced technical issues uploading their patient rosters (Dkt. #45-6 at pp. 6–75). The Hospital alleges that the technical errors kept it from receiving any confirmation that it had submitted its roster (Dkt #45 at pp. 15–16). However, all four call records show that the UIP Portal returned an error code rather than nothing (Dkt. #45-6 p. at 13 ("It says, there was an error with the file you tried uploading."); Dkt. #45-6 p. at 25 ("I was trying to send an upload batch roster . . . and it keeps giving me an error message even after I had the clear file."); Dkt. #45-6 p. at 41 ("I'm trying to upload a new patient roster, and I keep getting an error message, and it says to call the support center."); Dkt. #45-6 p. at 50 ("The reason I'm calling is, I'm trying to submit my—huh. My patient batch, but it keeps telling me that the service code is incorrect. . . .")). Each of these providers was notified in real time of an error. The purpose of those calls to was to resolve the error messages the provider received. The return of an error message is consistent with the original design of the UIP and does not give the Agency reason to investigate potential technology errors (Dkt. #14-6).

Further, the Administrative Record supports the Agency's conclusion that the Hospital did not successfully submit its patient roster and was not kept from submitting due to a technical error with the UIP Portal. The Hospital, while familiar with the submission process, did not provide any submission confirmation (*See* Dkt. #45-5 at p. 448). Additionally, the Agency did not receive complaints from other users who also attempted to submit a claim, yet did not receive any type of

12

validation (Dkt. #49 at p. 24; Dkt. #45-6 at pp. 6–75). The Agency considered this data in its decision to reject the Hospital's claim (*See* Dkt. #45-5 at p. 470).

In light of the Hospital's inability to produce submission confirmation, the high volume of successful submissions, electronic data showing that the Hospital did not submit a patient roster, and call data showing inconsistencies in the attorney's testimony, the Agency provided a satisfactory explanation for not providing the reimbursement. Although the Hospital has produced evidence that the technical issues occurred relating to the UIP program, it has not produced evidence showing that these technical issues impacted a providers' ability to upload a patient roster (*See* Dkt. #6-2 at ¶ 7; Dkt. #6-3). Rather, the Agency has produced evidence that these technical issues did not extend to a provider's ability to upload a patient roster (*See, e.g.*, Dkt. #17-1 at ¶¶ 12–13). *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43.

The Court does not find that the Agency acted arbitrarily and capriciously by not providing a reimbursement to the Hospital because the Agency has articulated a satisfactory explanation for its action including a rational connection between the facts and the decision.

## II.     The Agency's Decision Not to Extend the Claim Submission Deadline

The Hospital argues that the Agency's decision to not extend the claim submission deadline in light of known technical errors was arbitrary and capricious. (Dkt. #45 at p. 22). The Hospital claims that these technical errors made it impossible for users to successfully submit their patient rosters within the claim submission deadline and constitutes an important aspect of the problem (Dkt. #45 at p. 22). Therefore, the Hospital argues that failing to consider these technical errors in its decision to not extend the deadline, was arbitrary and capricious (Dkt. #45 at p. 22). The Court disagrees for the same reasons stated above. The Agency is required to articulate the connection between the facts and the decision. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43. Here, it did.

### A.    Creating the March 22, 2022 Claim Submission Deadline

The Agency considered the relevant data and determined that a March 22, 2022 deadline gave users adequate time to submit their claims. The Agency UIP funding was limited from the outset: the UIP could only distribute funds that Congress had appropriated (Dkt #14-3 at pp. 2–3). In late 2021, the UIP was issuing approximately $2 billion per month in reimbursements, and the federal government projected that providers would deplete its limited funding by mid-March 2022 (Dkt. #49-1 at ¶ 43). Subsequently, the White House announced the impending shutdown of the UIP due to a lack of sufficient funding (Dkt. #14-1 at ¶ 40). The HRSA FAQ's informed users that it will distribute funds as long as the funds are available (Dkt. #14-3 at p. 18). Additionally, the information required by providers to submit their patient rosters is minimal. On March 17, 2022, the first day after the announcement, providers submitted over five million patient records to the UIP Portal (Dkt. #17-1 at ¶ 9). In light of these facts, the Agency made a reasonable decision to set the March 22, 2022 claim submission deadline. Therefore, the creation of the March 22, 2022 deadline was not arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43.

### B.    Refusing to Extend the Claim Submission Deadline

The Hospital claims that the Agency's failure to extend the deadline in light of technical errors was arbitrary and capricious (Dkt #45 at p. 22). The Administrative Record does show that users experienced issues receiving patient IDs to use in submitting their claims (Step Four); however, the Administrative Record does not show that users experienced issues uploading patient rosters (Step Two) (*See* Dkt #45-5 at pp. 458–59, Dkt. #45-6 at pp. 6–75). The technical issues faced by health care providers and referred to in the April 5, 2022 email related to the issuance of temporary IDs (Step Three) (Dkt #45-5 at pp. 469–71). However, the technical issues at Step Three

14

did not implicate Plaintiff because Plaintiff did not successfully complete Step Two. (*See* Dkt #45-5 at p. 470).

Additionally, while Savitala's affidavit mentions difficulties, the Agency was unaware of these difficulties until March 23, 2022 during the phone call between Savitala and OptumServe Customer Support (Dkt. #14-21). Therefore, the Agency's decision not to extend the deadline in light of a complaint made after the deadline does not render the decision arbitrary and capricious. The call records further indicate that issues experienced by other providers showed that the UIP was providing messages in accordance with the UIP's design. The Court finds that the Agency did not act arbitrarily and capriciously by not extending the deadline, given the relevant data at the time.

The Hospital's cited authorities are unavailing. The Hospital relies on *Texas v. United States* and *National Urban League v. Ross* to support its position (Dkt. #45 at pp. 21–23). In *Texas v. United States* the Court granted a preliminary injunction after it found that there was "no indication that DHS went through the factors that Congress intended it to consider in its decision-making process, nor does the administrative record show what aspects of this issue were seriously considered." *Texas v. United States*, 524 F. Supp. 3d 598, 655 (S.D. Tex. 2021). The case at hand is materially distinguishable. Here, the Agency can identify what part of the Administrative Record it relied upon in its decision making. Accordingly, the Agency did not act arbitrarily because it was able to provide a logical connection between the facts and its decision. Similarly, the Hospital's reliance on *National Urban League* also rings hollow. In *National Urban League*, complying with the deadline was impossible. *Nat'l Urb. League v. Ross*, 489 F. Supp. 3d 939, 1002 (N.D. Cal. 2020). Here, providers successfully submitted over one hundred thousand batches within the deadline (Dkt. #17-

1 at ¶ 9). The Agency did not set a deadline which presented a physically impossibility to comply with. Therefore, its decision was not arbitrary and capricious.

Thus, the Court finds that the Agency considered the relevant data and determined a reasonable claim submission deadline and does not find that the Agency failed to consider important aspects of the problem. *See Citizens for Clean Air & Clean Water in Brazoria Cnty.*, 98 F.4th at 190.

## III.    The Hospital's Reliance Interests

The Hospital argues that the Agency's decision not to reimburse the Hospital and not extend the UIP shutdown deadline was arbitrary and capricious because it failed to consider the Hospital's good faith reliance interests (Dkt. #45 at pp. 23–25). The Hospital claims that the Agency, acting through the OptumServe representative, informed Savitala that the Hospital's submission was visible in the UIP Portal (Dkt. #1-1 at ¶ 7). The Hospital claims it relied on this representation and did not attempt to resubmit its patient roster (Dkt. #45 at p. 23). The Hospital supports this claim through the Savitala affidavit (Dkt. #1-1). In this affidavit, the Hospital's Chief Legal Officer states that during a phone call with an OptumServe representative on March 22, 2022, the representative informed Savitala that the Hospital's submission was in the portal (Dkt. #1-1 at ¶ 7). As explained below, the Hospital's argument is unpersuasive.

The Hospital's claim rests entirely on the testimony of Savitala. The Hospital does not claim that the Agency failed to consider the Hospital's reliance interests in its decision to create the March 22, 2022 deadline, but rather in its decisions to not reimburse or extend the deadline (Dkt. #45 at p. 23).

The Court finds that the Administrative Record does not support the Hospital's claim. The OptumServe call record shows that the call did not occur until March 23, 2022 (Dkt. #14-21). The

notes from the call log state that the roster was "not showing in the Dashboard" and "[s]ample patient name not showing in dashboard" (Dkt. #14-21). The Administrative Record does not suggest that the OptumServe representative made any representation during the call which confirmed the Hospital's submission (*See* Dkt. #14-21). Further, nowhere in the Administrative Record is there a record of a call occurring on or before March 22, 2022 (*See, e.g.*, Dkt. #45-5 at p. 470). Therefore, the Agency's decision to reject the Hospital's claim and not extend the claim submission deadline was not arbitrary and capricious because it did not fail to consider legitimate reliance interests of the Hospital.

The Fifth Circuit requires agencies to consider the reliance interests that its longstanding policies may have caused along with alternatives that are within the ambit of existing policy. *See R.J. Reynolds Vapor Co.*, 65 F.4th at 189. In the case at hand, the Hospital is not contesting a decision to change a longstanding policy, rather the Hospital is contesting a decision not to make an exception to its stated policy (Dkt. #45 at p. 23). Here, the Agency gave notice of the steps required to obtain a reimbursement (Dkt. #14-3). Additionally, the Agency's position regarding exceptions and overdue submissions was consistently disclosed throughout the program's lifetime (Dkt. #14-3 at pp. 11–12).

Yet again, the Hospital's cited authorities are unavailing. *R.J. Reynolds Vapor Company v. Food & Drug Administration* is not analogous to the Hospital's situation. The Hospital is not contesting a surprising policy change (Dkt. #45 at p. 23). The Agency's longstanding policy gave notice to providers that claims are subject to timely filing limits (Dkt. #14-3 at pp. 11–12). Additionally, the Agency's policy did not represent to the Hospital that exceptions would be made if providers had difficulty submitting claims (*See* Dkt. #14-3). The Administrative Record does not

show that the Agency surprised the Hospital by changing a policy or position relied upon by the Hospital. Therefore, the Agency did not act arbitrarily and capriciously in its decision not to make an exception for the Hospital.

Accordingly, the Court holds that the Agency's decisions to reject the Hospital's claim and not extend the claim submission deadline were reasonable in light of the Administrative Record. Having failed to meet the high standard necessary to demonstrate that the Agency's actions, both in rejecting the Hospital's claim and in refusing to extend the claim submission deadline, were arbitrary and capricious, the Court grants summary judgment to Defendants.

## CONCLUSION

It is therefore **ORDERED** that Plaintiff's Motion for Summary Judgment (Dkt. #45) is hereby **DENIED** and Defendant's Cross Motion for Summary Judgment (Dkt. #49) is **GRANTED**.

It is further **ORDERED** that Plaintiff's claims are **DISMISSED with prejudice**. Separately, the Court will issue a final judgment.

**IT IS SO ORDERED.**

**SIGNED this 19th day of August, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE